44 A.3d 1043

**KRAUSE MARINE TOWING CORP., et al.**

v.

**ASSOCIATION OF MARYLAND PILOTS, et al.**

No. 561, Sept. Term, 2010.

Court of Special Appeals of Maryland.

May 31, 2012.

196

Allan P. Hillman, Hamden, CT & Donna M.B. King, Towson, MD (Kern Hillman, LLC, on the brief), for Appellant.

Jonathan R. Krasnoff, Baltimore, MD, & James W. Barlett, III, Baltimore, MD (Douglas F. Gansler, Atty. Gen., Richard A. Tabuteau, Semmes, Bowen & Semmes, on the briefs), for Appellee.

KRAUSER, C.J., KEHOE and HOTTEN, JJ.

KEHOE, J.

At the heart of this appeal is an antitrust challenge to the work assignment rules of the Association of Maryland Pilots (the "Association") as they affect pilotage and tug services rendered to cargo ships in the Port of Baltimore.

Appellants, Krause Marine Towing Corporation ("KMTC"), a company that provides tug services, and Joseph L. Krause, Jr. ("Krause"), a docking master licensed by the Maryland Board of Pilots (the "Board"), filed a multi-count complaint in the Circuit Court for Baltimore City against the State, the Board, the Association, and several individual members of the Association.[1] At trial, the court granted appellees' motion for judgment at the conclusion of appellants' case in chief. Before this Court, only two of appellants' claims remain in dispute: (1) KMTC's assertion that the Association inhibited its ability to compete for tug business in violation of Maryland's Antitrust Act, see MD.CODE ANN., COM. LAW ("CL") §§ 11–201 et seq. (1975, 2005 Repl.Vol.), specifically, CL § 11–204(a) (stating that "[a] person may not ... unreasonably restrain trade or commerce."); and (2) Krause's claim that the Maryland Pilots Act (the "Act"), see MD.CODE ANN., BUS. OCC. & PROF. ("BOP") §§ 11–101 et seq. (1989, 2010 Repl.Vol.), infringes upon his right to contract freely.

Appellants present four issues to us. First, KMTC asserts that the trial court erred in granting the Association's motion for judgment on KMTC's antitrust claim. We hold that the trial court did not err because KMTC did not prove that the Association's work rules unreasonably restrained competition.

Second, KMTC argues that the trial court erred in permitting the Association to assert a statute of limitations defense at trial, thus limiting its claim for damages. We need not

---

1. The claims against some of the individual defendants were dismissed prior to trial. The remaining individual defendants are Eric A. Nielsen, John Traut and Alan Watts. On appeal, the assertions against them are not distinct from the claims against the Association itself. When we refer to the Association as a party in this opinion, we are referring to the entity and the three members collectively.

address this contention because we have decided against KMTC on its antitrust claim. As KMTC concedes, the statute of limitations issue would only be relevant if we decided in favor of KMTC on the merits of this appeal.

Third, Krause contends that the trial court erred in granting the State's motion for judgment on his claim that Maryland docking masters should not be required to be members of the Association. Krause argues that this requirement is an unconstitutional exercise of the State's police power. This contention, as presented to this Court, has not been preserved for appellate review.

Finally, both appellants argue that the trial court erred by failing to issue a declaratory judgment as to their antitrust and constitutional claims. We agree. In disposing of appellants' claims, the trial court failed to enter a declaratory judgment, and we will remand the case to the circuit court for entry of a judgment declaring the rights of the parties in accordance with this opinion.

## BACKGROUND

### Overview: Pilotage and Tug Services in the Port of Baltimore

The majority of the relevant facts that fuel this dispute arise from tug boat activities in the Port of Baltimore. The Port is one of the busiest in the United States.[2] The container,

---

**2.** "The Port of Baltimore plays a vital role in Maryland's economy, generating $3.2 billion in annual revenue and local purchases, as well as supporting 50,700 jobs." *Maryland At A Glance: Port of Baltimore*, Maryland State Archives (Mar. 27, 2012), http://www.msa.md.gov/msa/ mdmanual/01glance/html/port.html. "It serves over 50 ocean carriers making nearly 1,800 annual visits." *Id.* "Total cargo moving through the Port in 2010 amounted to 33 million tons, up from 22.3 millions tons in 2009." *Id.* "Moreover, the value of cargo traveling through the Port in 2010 increased to $41.5 billion, up from $30.2 billion in 2009." *Id.* The Port handles more automobile, farm and construction machinery imports than any other port in the nation. *Id.* Baltimore is one of only two ports on the East coast where the main shipping channel is 50 feet deep. *Id.* There are two routes by which vessels can reach the Port via the Chesapeake Bay: one from the South that originates at Cape

vehicle transport, and bulk carrier ships that use the Port are enormous: they can be more than three football fields long, up to 138 feet wide and can draw nearly 48 feet. These vessels are too large to berth and unberth by themselves; they require the assistance of tug boats to safely accomplish this task.

There are two types of pilots that help guide these maritime behemoths into and out of port. The first are bay pilots (also referred to as harbor pilots), who direct vessels from the open sea through the Chesapeake Bay to the ship's port of destination (and vice versa). S.B. 237 (2000), Fiscal Note at 2.[3] The

---

Henry and one from the North that originates at the Chesapeake and Delaware Canal.

**3.** Some background information in this opinion derives from the fiscal notes of Senate Bill 237 (2000) and House Bill 884 (2004). As we will discuss more fully *infra*, Senate Bill 237 established a State Board of Docking Masters; House Bill 884 abolished the State Board of Docking Masters and transferred the regulatory authority of such masters to the State Board of Pilots. We will use these fiscal notes to aid our discussion of pilotage in Maryland. *See Robey v. State*, 397 Md. 449, 457, 918 A.2d 499 (2007) (relying on a fiscal note as evidence to support a particular statutory interpretation); *Moore v. State*, 388 Md. 623, 636 n. 4, 882 A.2d 256 (2005) (explaining that a fiscal note is a part of the General Assembly bill file that may be considered in determining legislative intent).

The fiscal note to SB 237 (2000) is available at: http://mlis.state.md.us/PDF–Documents/2000rs/fnotes/bil_0007/sb0237.pdf.

The fiscal note to House Bill 884 (2004) is available at: http://mlis.state.md.us/pdf-documents/2004rs/fnotes/bil_0004/hb0884.pdf.

Other background information in this opinion is borrowed from various "sunset review" publications. Under the Maryland Program Evaluation Act, *see* MD.CODE ANN. STATE GOV'T ("SG") §§ 8–401 *et seq.* (1984, 2009 Repl.Vol.), the Department of Legislative Services conducts periodic legislative reviews of the activities of Maryland's executive branch. This review process is known as a "sunset review" because the agencies subject to review usually have termination dates in their authorizing statutes. *See Sunset Review*, Department of Legislative Services (March 27, 2012), http://dls.state.md.us/Content.aspx?page=105. The purpose of the review process is to "determine whether a governmental activity is necessary for the public interest" and to "make units that are responsible for necessary governmental activity accountable and responsive to the public interest. . . ." SG § 8–402(b)(1).

Throughout this opinion, we will cite to the sunset review publications of November 2000 (not available online), October 2001 (available at, http://dlslibrary.state.md.us/publications/OPA/S/F/Pilots_2001.pdf)

second are docking masters (also called docking pilots), whose primary responsibility is to coordinate and direct the services of tugs to maneuver a ship as it moors and unmoors. H.B. 884 (2004), Fiscal Note at 5. Krause is a docking master; the regulation of docking masters (as opposed to bay pilots) is at the heart of this appeal.

Moving these ships through the Chesapeake Bay to their destination requires tightly planned coordination. Each steamship line that does business in the Port of Baltimore maintains a "ship's agent." Prior to the arrival of a vessel in the Chesapeake Bay, the ship's agent notifies the Association that a bay pilot is needed to guide the ship to Baltimore. Sunset Review (2001) at 27. As the ship nears its destination, the ship's agent makes arrangements for the mooring of the vessel by notifying the Association that a docking master is required and by contacting a tug company. The Association assigns jobs according to established work rules that provide for rotation among pilots and docking masters. (We will discuss these work rules more fully later).

Three ship-docking tug companies serve the Baltimore harbor: KMTC,[4] McAllister Towing of Baltimore, Inc., and Moran Towing Corporation. Each company owns a number of tugs that vary in utility for a given job because of size, design and engine power. Either directly or through affiliates, McAllister and Moran provide tug services to numerous commercial ports in the United States. KMTC focuses primarily on the Port of Baltimore. The three marine tug companies compete for business. In contrast, as we will explain, docking masters have a legally-established monopoly for their services and their fees are regulated by the Public Service Commission.

---

and December 2009 (available at, http://dls.state.md.us/data/polanasubarc/polanasubarc_sunrev/Pilots.pdf).

**4.** At the time of trial, KMTC was owned by Krause's wife, Joann Krause, and his son, David Krause. From 1989 to 2000, Krause was a part owner of KMTC. In 2000, Krause relinquished his stake in KMTC.

## The Disputes

There are two separate claims that we must address in this case. One involves an antitrust claim brought by KMTC against the Association. The other involves a constitutional challenge to the Act brought by Krause against the State. Both claims involve the Association's work rules for docking masters.

The Association's work rules, dated February 2009, were entered into evidence before the trial court. These rules establish a rotation schedule so that each docking master is subject to approximately the same workload. Sunset Review (2009) at 4. Under these rules, docking masters work two weeks on duty and two weeks off duty, and when they are on duty they complete a three-assignment turn. When the three assignments are completed, the docking master returns to the back end of the rotation schedule. Critical to the underlying dispute in this case, when a ship's agent contacts the Association's dispatch unit to obtain a docking master for a ship, the docking master at the front end of the rotation schedule is automatically assigned to that vessel. As a result, steamship lines cannot contract directly with a particular docking master, nor can a docking master control which steamship line he or she serves on a regular basis.

While the three tug companies actively compete for customers and commonly make arrangements with individual steamship lines to provide tug services to that line's vessels, the custom of the industry gives the assigned docking master final say in determining which and how many tugs are adequate for the job. See *Cooper/T. Smith, Inc. v. NLRB*, 177 F.3d 1259, 1264–65 (11th Cir.1999) ("Once a docking pilot receives the schedule of ships docking and undocking in the port on a given day, he decides the number of tugs that will be needed based upon factors such as the dimensions and power of the ship and tidal conditions."); *Guy v. Donald*, 203 U.S. 399, 404, 27 S.Ct. 63, 51 L.Ed. 245 (1906) (describing the pilot, who was a member of the Virginia Pilots Association, as the "sole master of his course" with a free ability "to do what he thought best"

and "no duty to obey" advice from fellow pilots).[5] If the assigned pilot decides that the tugs provided by a tug company are not adequate for a job, either the shipping line or the tug company must hire additional tugs.

KMTC argues that this setup interferes with its contracts with steamship lines because the system prevents both steamship lines and KMTC from selecting the docking master of their choice. Because neither a steamship line nor a tug company can select its own docking masters, KMTC cannot ensure that the assigned docking master—given the pilot's discretion as to the type and number of tugs necessary for a particular job—will decide that KMTC's tugs are adequate, even though KMTC has a contract with the steamship line.

KMTC asserts that "[t]he prime example" of its problem with the rotation system is seen at the New Ore Pier located at Sparrows Point. It claims that, in 2004, the Association passed a special guideline that caused it to lose work. The guideline stated that vessels with a draft of 44 feet attempting to moor or unmoor at that facility must use at least three tugs, each with at least 3000 horsepower and the ability to maintain a 90 degree angle to the vessel. KMTC asserts that the guideline was adopted because of a dredging project in the area but that the guideline remained in place even after the dredging was completed. KMTC asserts that it does not own three tugs that comply with the guideline and that the requirements listed in the guideline are no longer necessary to safely moor vessels at Sparrows Point. As a result of the guideline, some docking masters have refused to use KMTC tugs at Sparrows Point. As explained by KMTC, if it had the power to bypass the rotation system and select its own pilot, then, in the event the initially scheduled pilot decided that

---

**5.** This principle was confirmed by the testimony of Captain Michael Duarte, a docking master in Boston's harbors and KMTC's expert witness on tugboat capabilities, who agreed that a docking master must exercise discretion in "choosing how to accomplish a particular job" and stated further that this "would have a lot to do with the docking pilot, his experience, knowing his boats and the people running the boats ... and knowing the waters and the berths."

KMTC's tugs did not meet the Sparrows Point guidelines, KMTC could select a different pilot willing to do the job.

KMTC also points to three instances when individual docking masters decided that, under the weather and environmental conditions at the time, KMTC's tugs were inadequate to safely moor a ship. As an example, Joann Krause testified on behalf of KMTC that a docking master, Captain Jankowiak, refused to dock a ship, the M/V MAKIKI, in winds blowing at 25 knots with single screw tugboats owned by KMTC. KMTC alleges that this is just one example of a docking master obstructing the work of KMTC "under the guise of safety, to prevent [KMTC] from executing its contracts with the shipping companies."

Krause's grievance against the State is much narrower. He asserts that docking masters should not be forced to be members of the Association; instead, he argues that masters should be able to work independently of the Association's work rules. Krause challenges this required membership as an infringement on his freedom of contract rights.

### The Trial Court Proceedings

KMTC and Krause filed suit in the Circuit Court for Baltimore City on July 18, 2008 and thereafter filed an eleven count amended complaint asking for compensatory and punitive damages and declarative and injunctive relief. The amended complaint listed the following defendants: the State, the Board, the Association, and various members of the Association.

In November 2009, the trial court issued several orders granting summary judgment in favor of appellees as to several counts. In December 2009, at the time of trial, only six counts remained: namely, Count V (antitrust claim by KMTC against the Pilot Defendants and the Association); Count VI (antitrust claim by KMTC against the State of Maryland for enacting BOP § 11–603); Count VII (freedom of contract claim by KMTC against the State); Count IX (antitrust claim by KMTC against the State for granting authority to the Board

of Pilots); Count X (antitrust claim by Krause against the State); and Count XI (freedom of contract claim by Krause against the State). The court conducted a five day bench trial on these counts.

Appellants filed a motion for declaratory judgment but, on the first day of trial, requested the court to defer a ruling on its motion until after trial, which the trial court agreed to do. Upon the conclusion of appellants' evidence, appellees moved for judgment. The court received extensive argument on the motion on January 22, 2010.

On April 22, 2010, the trial court issued an order, granting appellees' motions for judgment. The order stated:

> Having considered the plaintiff's evidence at trial on December 8, 9, 10, 11 and 14, 2009; having considered the oral and written motions of the defendants for judgment; having considered the plaintiffs' arguments in opposition; and having considered the defendants' replies thereto, it is this 22nd day of April, 2010, hereby,
>
> ORDERED that the "Motion for Judgment" filed by the Association of Maryland Pilots, Eric A. Nielsen, John Traut, and Alan Watts and the "Motion for Judgment" filed by the State of Maryland, the Maryland State Board of Pilots and Eric Nielsen in his capacity as a member of the Maryland State Board of Pilots are GRANTED *for the reason that the plaintiffs failed to present any credible evidence sufficient to establish any of their claims against any of the defendants.* (Emphasis added).

Appellants filed a Notice of Appeal and, after the parties obtained a clarifying order from the circuit court entering judgment in favor of appellees on Counts V, VI, VII, IX, X and XI, appellants filed a Supplemental Notice of Appeal. This Court consolidated the appeals. The appeal only concerns Counts V and XI.

### ANALYSIS

Maryland Rule 2–519(b) provides that "[w]hen a defendant moves for judgment at the close of the evidence offered by the

plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff. . . ." We review the court's legal conclusions *de novo. Cattail Assocs. v. Sass,* 170 Md. App. 474, 486, 907 A.2d 828 (2006). In contrast, we set aside a trial court's factual determinations only when they are clearly erroneous and, in making that evaluation, we must "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Maryland Rule 8–131(c).

The trial court found "that the plaintiffs failed to present any credible evidence sufficient to establish any of their claims." It did so without stating what specific evidence it found to be unworthy of belief. This presents a significant challenge for the appellants because it is "almost impossible for a judge to be clearly erroneous when he is simply not persuaded of something." *Bricker v. Warch,* 152 Md.App. 119, 136, 831 A.2d 453 (2003) (emphasis removed); *see also Starke v. Starke,* 134 Md.App. 663, 680–81, 761 A.2d 355 (2000) ("Mere non-persuasion, on the other hand, requires nothing but a state of honest doubt. It is virtually, albeit perhaps not totally, impossible to find reversible error in that regard."). Appellants have tailored their appellate contentions accordingly, limiting themselves to those based upon facts that were not challenged at trial.

## I. The Association's Rotation System and the Maryland Antitrust Act

KMTC contends that the "Association has a state-granted monopoly over docking in the Port [of Baltimore]" and that the "anti-competitive effect [of the monopoly] outweighs the pro-competitive effect, if any." KMTC further argues that the Association's work rules, which allow docking masters to bypass KMTC's tugboat services, significantly harm its opportunity to compete with the two larger, higher priced towing companies. This, according to KMTC, not only negatively affects its own business, but it also raises prices in the towing market and hurts the bottom line of the steamship companies serving Maryland's ports. In short, KMTC contends that the

Association's work rules impose an unreasonable restraint on competition and violate state antitrust laws.

The factual scenario that gives rise to this claim against the Association, and the basis of KMTC's antitrust argument, is summarized in the testimony of Joann Krause, a part owner of KMTC. She explains:

> [T]here is a serious problem with the [Association's] rotation system ... The pilot calls [ ] in certain instances and says that he is not going to do the job with my tugs for whatever reason, whether it's windy, there's not enough water under the draft, it's not enough bollard pull,[6] it's not enough horsepower, whatever it is. [And] I don't have the luxury of going down the list [to select another pilot], even though there are pilots qualified to do the work, I'm at a standstill. I lose the work.... and this is my problem. And that's really why I'm here.

Thus, in a situation where a docking master decides that he or she cannot safely perform a particular job using KMTC services, KMTC believes it should have the option to designate another docking master to perform the job in the place of the docking master assigned by operation of the Association's rotation system. It is only this situation, *viz.*, "where [KMTC is] not allowed to seek and secure a docking pilot who would trade with the assigned pilot and do [KMTC's] work," that KMTC objects to on appeal and complains is an unreasonable restraint on trade.[7]

■ Before we begin our analysis of KMTC's antitrust claim, we note that, if a trial court grants a motion for judgment without clearly articulating its reason for doing so,

---

**6.** "Bollard pull" is a term for the towing capacity of a tug.

**7.** In its brief, KMTC asserts that it "does not challenge the rotation system itself" but rather challenges "the aspect of the Association's work rule rotation system ... that restrains and excludes [KMTC] from competing to serve some of its own customers." To the extent we can distinguish these two positions, we interpret this to mean that KMTC only criticizes the rotation system as it affects its preexisting contracts with shipping lines, not as it operates generally.

we will affirm the trial court's decision to grant the motion for judgment if the record indicates that at least one of the grounds asserted by the moving party supported the court's decision. *See Smigelski v. Potomac Insurance Co.,* 403 Md. 55, 61, 939 A.2d 189 (2008); *Phillips v. Allstate Indem. Co.,* 156 Md.App. 729, 740, 848 A.2d 681 (2004); *Ross v. Am. Iron Works,* 153 Md.App. 1, 10, 834 A.2d 962, (2003) (stating the proposition that in a summary judgment context an appellate court will affirm a trial court's decision if the record indicates that at least one of the grounds asserted in favor of the motion for summary judgment supported the trial court's decision).

The Association based its motion for judgment on the following grounds:

(1) The Association could not constitute a "combination or conspiracy" for purposes of an antitrust violation;

(2) The Association's rules are not governed by the Sherman Act because they are the product of a clear policy of the State and are actively supervised by the State;

(3) Any alleged restraint of trade is not unreasonable;

(4) KMTC failed to prove the monetary damages it claimed; and

(5) Most of the monetary damages KMTC claims are time-barred.

We will focus on the Association's third issue—whether the alleged restraint of trade by the Pilots Association was reasonable—in analyzing this case.[8]

---

8. We have selected the third issue partly as a result of a process of elimination. With regard to the first issue, we cannot determine whether the concerted action by the Pilot Defendants could constitute a conspiracy to violate § 1 of the Sherman Act because the record contains very little relevant information. *See American Needle, Inc. v. NFL,* —— U.S. ——, 130 S.Ct. 2201, 2209, 176 L.Ed.2d 947 (2010) (Whether parties are engaged in a conspiracy to violate § 1 of the Sherman Act is not based upon legal formalities but rather on "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate.").

As for issue two, the Association claims that it is immune from liability under the state action doctrine. The state action doctrine is an

Maryland's Antitrust Act was enacted "to complement the body of federal law governing restraints of trade, unfair competition [and related matters] . . . in order to protect the public and foster fair and honest intrastate competition." CL § 11–202(a)(1). This statute "is essentially the same as § 1 of the Sherman Antitrust Act, . . . 15 U.S.C. § 1." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 53, 485 A.2d 663 (1984). The General Assembly made explicit its intent "that, in construing [the Antitrust Act], courts are to be guided by the interpretation given by federal courts to the various federal statutes dealing with the same or similar matters. . . ." CL § 11–202(a)(2). Decisions of federal courts interpreting the Sherman Antitrust Act guide our analysis in this case. *Id.; accord State v. Jonathan Logan, Inc.*, 301 Md. 63, 66–68, 482 A.2d 1 (1984); *Greenbelt Homes, Inc. v. Nyman Realty, Inc.*, 48 Md.App. 42, 426 A.2d 394 (1981).

"The purpose of Sherman Act § 1 is to prevent agreements that unduly restrain trade." 7 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 1511c at 465 (3rd ed.2010). "An undue restraint is one that tends to impair competition signifi-

affirmative defense to an antitrust claim that requires a defendant to show "first, [that] the State has articulated a clear and affirmative policy to allow the anticompetitive conduct, and second, [that] the State provides active supervision of [the alleged] anticompetitive conduct undertaken by private actors." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 631, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992) (citation omitted). Because the trial court resolved this case on a motion for judgment, the Association was never required to present evidence on its state action defense. Thus, the record is scant as to the degree to which the Board actually supervised the Association's work rules.

With regard to issue four, the trial court's order granting judgment gives us no indication as to whether the court concluded KMTC's evidence as to damages was credible.

Finally, we will not focus on the argument that most, but not all, of KMTC's claimed damages were time-barred because resolving this issue would not fully address the disputes between the parties.

In contrast, the record is sufficient for us to determine whether the anti-competitive effects of the Association's work rules are reasonable. Moreover, in light of the importance of docking masters to the efficient operation of the Port of Baltimore, resolution of this question is in the public interest.

cantly without adequate justification." *Id.* There are three modes of analysis that courts utilize in determining whether a restraint violates antitrust laws: (1) a *per se* analysis; (2) a "quick-look" analysis; and (3) a "rule of reason" analysis.

Restraints are *per se* unlawful when "their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *accord State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). *"Per se* treatment is appropriate once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *State Oil,* 522 U.S. at 10, 118 S.Ct. 275 (citation and quotations marks omitted).

Under the "quick-look" scheme, there is usually some pro-competitive justification for the restraint (thus, the unreasonableness of the restraint is not clear enough to warrant a *per se* analysis); but nonetheless, an elaborate analysis is not needed because "the great likelihood of anti-competitive effects can easily be ascertained." *Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999). Courts apply a "quick-look" analysis only "to business activities that are so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability." *Texaco Inc. v. Dagher,* 547 U.S. 1, 7 n. 3, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006). If an arrangement "might plausibly be thought to have a net pro-competitive effect, or possibly no effect at all on competition," more than a "quick-look" is required, and a court must conduct "a more thorough enquiry into the consequences of those restraints...." *Cal. Dental,* 526 U.S. at 759, 771, 119 S.Ct. 1604.

Under a full "rule of reason" analysis, a court must "decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on com-

petition." *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). Under the classic formulation of the "rule of reason," articulated by Justice Brandeis in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

The Court of Appeals has adopted the rule of reason analysis for claims arising under Maryland's Antitrust Act. *Natural Design*, 302 Md. at 54–55, 485 A.2d 663.

We will analyze the alleged restraint in this case using the "rule of reason." On appeal, KMTC does not assert, and the Association does not contest, that either a *per se* analysis or a "quick-look" analysis is appropriate; both parties posit that the rule of reason applies to these facts. Our analysis proceeds from this standpoint.[9]

---

**9.** A "rule of reason" analysis is conducted in various stages, where each party must satisfy an initial burden before a court conducts a complete review of the relevant facts. As stated in *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 317 (2d Cir.2008):

> Under the rule of reason, the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market. Because the antitrust laws protect competition as a whole, evidence that plaintiffs have been harmed as individual competitors will not suffice. If the plaintiffs satisfy their initial burden, the burden shifts to the defendants to offer evidence of the pro-competitive effects of

*The Rule of Reason applied to KMTC's Antitrust Claim*

Our first task in conducting a "rule of reason" analysis is to identify specifically the alleged practice or restraint that KMTC complains has an anti-competitive effect. Lawrence A. Sullivan, ANTITRUST, § 68 at 187 (1977) ("To apply the rule [of reason], one must first identify specifically the practice involved."). Here, the relevant restraint that KMTC challenges is the Association's rotation system; more specifically, as stated in KMTC's brief, KMTC challenges "the aspect of the Association's work rule rotation system" that "denies marine towing companies (and vessel owners) the right to seek to use an 'independent contractor' docking pilot of their choice to perform docking services for their customers." With this alleged restraint in mind, we will consider the "rule of reason" factors that are relevant to the facts of this case. Because of the nature of this dispute, much of our "rule of reason" analysis will focus on background information and "the facts peculiar to maritime pilotage." Specifically, in this first portion of the analysis, we will address (1) the historical evolution of the Act and Maryland's pilotage regulations; (2) the authority that the Act gives to the Board; (3) the duties of the Association in administering pilotage work rules; (4) the development of the law regulating docking masters; (5) the addition of the conflict of interest provision, BOP § 11–603, to the Act; and (6) the effect of these developments on tug companies in the Port of Baltimore. After providing this background information and discussing "the facts peculiar to maritime pilotage," we will then proceed to address the history of the restraint, the evil sought to be addressed by the

---

their agreement. Assuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means. Ultimately, the factfinder must engage in a careful weighing of the competitive effects of the agreement—both pro and con—to determine if the effects of the challenged restraint tend to promote or destroy competition.

(Citation omitted). For purposes of this discussion, we will assume that each party has met its initial burdens and perform a full "rule of reason" analysis.

restraint, and the reasons for the particular remedy adopted by the Association.

We begin with the facts peculiar to maritime pilotage, "a unique institution [which] must be judged as such." *Kotch v. Board of River Port Pilot Comm'rs*, 330 U.S. 552, 558, 67 S.Ct. 910, 91 L.Ed. 1093 (1947). Pilots must possess substantial technical skill and knowledge to guide vessels amidst the "infinite variety of navigation hazards, currents, tides, sand bars, submerged objects, weather conditions and the like that mark the harbors . . . open to commercial vessels." *Jackson v. Marine Exploration Co.*, 583 F.2d 1336, 1338 (5th Cir.1978). These considerations apply as fully to docking masters as to other pilots. Nicholas J. Healy & Joseph C. Sweeney, THE LAW OF MARINE COLLISION 260 (1st ed. 1998) ("The tug master must know water levels, depth of water and state of the tides, currents, ordinary obstructions, width and length of channels, and clearance of bridges."). As Justice Black explained:

> Pilots are . . . indispensable cogs in the transportation system of every maritime economy. Their work prevents traffic congestion and accidents which would impair navigation in and to the ports. It affects the safety of lives and cargo, the cost and time expended in port calls, and, in some measure, the competitive attractiveness of particular ports.

*Kotch*, 330 U.S. at 558, 67 S.Ct. 910.

Every maritime state has both a mandatory pilotage requirement and pilot licensing regulations. Paul G. Kirchner & Clayton L. Diamond, *Unique Institutions, Indispensable Cogs, and Hoary Figures: Understanding Pilotage Regulations in the United States*, 23 U.S.F. Mar. L.J. 168, 187–89 (2011). Maryland is no exception. We will now address the specific aspects of Maryland's scheme at issue in this case.

### (1) The History of the Act

The General Assembly first passed a law regulating pilots of vessels in 1787. 1787 Md. Laws (November Session) at 277–

80.[10] The statute required ships above a certain size to use State-licensed pilots while in that portion of the Chesapeake Bay within the boundaries of the State, set out qualifications for licensure, and established a licensing and regulatory board.[11] *Id.* Growing from these core requirements, Maryland's pilotage law has been supplemented and amended many times throughout the years and is now codified as the Act.

Among other things, the current Act establishes the manner in which pilots are employed and compensated. Under BOP § 11–501(a), "[e]ach American vessel engaged in foreign trade and each foreign vessel shall employ a licensed pilot to pilot the vessel when it is underway on the navigable waters of the State, including when the vessel is towing or being towed by another vessel." Pilotage and docking master fees are established by the Public Service Commission. BOP § 11–502; *see also* MD.CODE ANN., PUB. UTIL. COS. ("PUC") §§ 4–303(a) and 4–303.1 (1998, 2010 Repl.Vol.) (The Public Service Commission establishes "fees and charges" for both pilotage services and docking services "at a just and reasonable rate."). These fees are paid by the owners of the vessels. BOP § 11–501(a).

Under the Act, all Maryland bay pilots and docking masters who service foreign ships are licensed by the Board. Additionally, these pilots are members of the Association. Sunset Review (2009) at 2. Pilots are regulated both by the Act, which the Board has been given authority to enforce, and by work rules passed by the Association. Thus, the Board and the Association play pivotal roles in the administration of pilotage

---

**10.** The text of the law is accessible at the Maryland State Archives website (vol. 204 in the online version) available at: http://www.msa. md.gov/megafile/msa/speccol/sc2900/sc2908/000001/000204/html/am 204—277.html.

**11.** As stated in the Preamble to Maryland's Pilotage Act of 1787:

WHEREAS it is necessary for the safety and preservation of vessels bound from this state to sea, or coming into Chesapeake bay . . . that able and experienced pilots should be established to conduct and pilot such vessels, for reasonable fees, to their several moorings, and that ignorant and unskillful persons should be prevented from undertaking such pilotage. . . .

1787 Md. Laws (November Session) at 277.

services in Maryland. A discussion of both entities is warranted.

### (2) The Board

The Board "has been in existence for over 200 years, and its priorities and legislative mandate remain largely the same today as when the Board was first established: to provide safety in navigation of Maryland's commercial waterways in the interests of the ships, the citizens of the State, and the environment." Sunset Review (2009) at 3. It is the express power of the Board to "adopt regulations and pass orders to govern and regulate licensed pilots." BOP § 11–205(a). BOP § 11–205(b)(2) states that "the Board shall . . . be responsible for safety in providing pilotage." To help ensure the pilots are properly trained, BOP § 11–305 authorizes the Board to determine which potential pilots are sufficiently qualified for the positions and allows the Board to determine how many pilots are "necessary to protect the commercial interests of the State." BOP § 11–305(b).

### (3) The Association

"All pilots licensed by the State Board of Pilots are also members of the Association of Maryland Pilots, founded in 1852." Sunset Review (2009) at 4. The Association plays two important roles in the State's regulatory scheme. First, it is the collection agent for the receipt and disbursement of all pilotage fees. BOP § 11–503; § 11–602(c)(1).[12] The Board

---

12. The concept of a centralized entity for collecting pilotage fees developed incrementally. By Chapter 214 of the acts of 1853, the "board of pilots" was charged with collecting license fees from vessels exempted from the mandatory pilotage requirement and distributing those revenues to licensed pilots. 1853 Md. Laws 278. The 1853 statute was codified as Article 74 § 19 of the Code of 1860. Shortly thereafter, the "board of pilots" was charged with collecting all pilotage fees. See Chapter 25, Acts of 1866, 1866 Md. Laws 35. This arrangement remained in effect for nearly a century. See MD. ANN.CODE (1904) Art. 74, § 19 and MD. ANN.CODE (1924) Art. 74, § 19. By Chapter 523 of the Acts of 1947, the Association was designated as the collection agent. 1947 Md. Laws 1282. Substantially the same statutory provision ap-

has the authority to require the Association to make retirement and disability payments to certain inactive pilots, *see* BOP § 11–504 and § 11–505, and to reserve a portion of its income in a capital replacement fund, disbursements from which can be made only with the Board's approval. BOP 11–506(a)–(c).

Second, the Association maintains work rules for its members. Rules that pertain to "pilot list administration, appointments [and] assignment intervals" must be approved by the Board, as well as rules that "affect safe operations of vessels by Maryland pilots." COMAR 09.26.04.01.

### (4) The Regulation of Docking Masters

Today, both the Board and the Association have the authority to regulate bay pilots and docking masters, but this was not always the case. Before 2000, docking masters were specifically exempt from the regulation and licensure requirements of the Act. Instead, docking masters held Coast Guard licenses entitling them to operate a tug and were usually employees of tug companies. Parks & Cattell, *supra*, at 999. The Coast Guard grew concerned about the accountability of docking masters because the Coast Guard licensing procedure did not involve an evaluation of the licensee's experience or skills in any docking master function. *Id.* at 1002. Following a series of administrative law proceedings involving negligence or misconduct by docking masters in other ports in the 1980's and 1990's, the Coast Guard "contacted the state authorities in those states in which the use of docking masters was common . . . to express concern that there were persons over whom no one was asserting jurisdictional control, who were docking and undocking vessels." *Id.* at 1002; *see also* Sunset Review (2009) at 6 ("Prior to 2000, . . . accountability in the event of a docking incident was not clearly defined.").

Maryland's Docking Master Law, enacted in 2000, addressed this regulatory gap by establishing a State Board of

---

peared in the 1951 and 1957 Codes, *see* MD. ANN.CODE (1951) Art. 74, § 12; MD. ANN.CODE (1957) Art. 74, § 1019, as well as in the current Act.

Docking Masters to license and regulate docking masters. *See* S.B. 237 (2000), Fiscal Note at 2 (explaining that the bill addresses the U.S. Coast Guard's concern "about which legal authority (the State or federal officials) has jurisdiction should there be an accident in the port itself.").

In 2004, however, with the passage of House Bill 884 (2004), the Docking Master Act was repealed, the Board of Docking Masters was abolished and the docking masters passed under the regulatory aegis of the State Board of Pilots. *See* BOP § 11–101(i) (defining "pilotage" to include "maneuvering a vessel during berthing and unberthing operations" and "shifting a vessel within a port with tug assistance."). Thus, beginning in 2004, both bay pilots and docking masters received their licenses from the Board and were both generally regulated by the Act.[13]

### *(5) BOP § 11–603—The Conflict of Interest Provision in the Act*

Of particular import to this appeal, the 2004 legislation added a conflict of interest provision to the Act. *See* BOP § 11–603.[14] Under BOP § 11–603, a licensed pilot may not

---

**13.** Not all bay pilots in Maryland waters hold a license issued by the Board. The United States Coast Guard licenses pilots for vessels that travel from one domestic port to another, *see* 46 U.S.C. § 8502 (2006), while Maryland licenses pilots for ships bound to or coming from foreign ports. BOP § 11–501; *see also* Alex A. Parks & Edward V. Cattell, Jr., The Law of Tug, Tow, and Pilotage 991 (3rd ed. 1994) ("In the United States, vessels engaged in the coastwise trade [i.e., from one domestic port to another] must be piloted by holders of Coast Guard-issued licenses, while vessels involved in foreign trade . . . must employ state-licensed pilots.").

**14.** § 11–603. **Licensed pilot—Conflicts of interest.**
 (a) *Prohibited.*—A licensed pilot may not engage in conduct that constitutes a conflict of interest.
 (b) *Circumstances.*—A conflict of interest exists in situations in which:
 (1) except as provided in subsection (c) of this section, a licensed pilot solicits or accepts financial or other consideration of value from a tugboat, towing, vessel-assist, vessel-owning, or vessel-chartering company, or an agent or officer of that company, or from any other entity providing services in the port community;

allow "personal financial interests to conflict with professional responsibilities," § 11–603(b)(3), and can be paid for his or her services only through the Association. BOP § 11–603(c)(1).

The General Assembly's decision to prohibit financial relationships between docking masters, tug companies and steamship lines is consistent with the independence of judgment traditionally afforded pilots:

> Under law and custom [pilots] have an independence wholly incompatible with the general obligations of obedience normally owed by an employee to his employer.[ ] Their fees are fixed by law and their charges must not be discriminatory. As a rule no employer, no person, can tell them how to perform their pilotage duties. When the law does not prescribe their duties, pilots are usually free to act on their own best judgment while engaged in piloting a vessel.

*Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 93–94, 75 S.Ct. 629, 99 L.Ed. 911 (1955) (plurality opinion) (citing, among other authorities, *The China*, 7 Wall. 53, 67, 19 L.Ed. 67 (1869); and *Smith v. Pierce*, 1 La. 350, 357–58 (1830)). As two commentators explained:

---

(2) a licensed pilot takes any action with the intent to benefit or harm the economic interests of a tugboat, towing, vessel-assist, vessel-owning, or vessel-chartering company, or any other entity providing services in the port community;

(3) a licensed pilot allows personal financial interests to conflict with professional responsibilities;

(4) a licensed pilot solicits business for a tugboat, towing, vessel-assist, vessel-owning, or vessel-chartering company, or any other entity providing services in the port community; or

(5) a licensed pilot discourages a person from engaging the services of a tugboat, towing, vessel-assist, vessel-owning, or vessel-chartering company, or any other entity providing services in the port community.

(c) *Circumstances—Conflict does not exist.*—A conflict of interest does not exist in situations in which:

(1) remuneration is paid to the pilot through the Association in return for the provision of pilotage services; or

(2) there is an exchange of nominal social pleasantries between the licensed pilot and any entity providing services to the port community.

A key aspect of the state pilotage system is that in virtually every circumstance the state pilot is independent of the vessel and the vessel operator. . . . The primary responsibility of every state pilot is to protect the public interest by facilitating the safe and efficient movement of vessels in state waters. *In that respect, the principal customer of the pilot's services is not the vessel's operator but rather the state and its public interests.[1]*

Kirchner & Diamond, *supra*, at 188 (emphasis added; footnote omitted).

*(6) The Effect of the Current Regulations on
Tug Services in the Port of Baltimore*

■ The Association's rotation system and the Act's conflict of interest provision, BOP § 11–603, both protect the independence of judgment traditionally afforded to pilots in a direct and concrete fashion. The evidence presented by KMTC demonstrates the difficulties faced by docking masters as they guide very large, unwieldy vessels to moorings in the face of narrow channels, high winds, and adverse tide conditions. Maryland's pilotage scheme allows pilots to perform their duties in an independent fashion, separate from the pressures that may stem from the vessel's operator. This serves to ease the tension between the interests of a shipping line—to have its vessels moored and unmoored as quickly and inexpensively as possible—and a docking master's duty to the public to perform those duties safely. The facts peculiar to pilotage support the notion that Maryland's fixed rotation system, which has the effect of immunizing docking masters from pressure from the master of a vessel, is a reasonable approach to a complex problem.

Next, we will discuss, concurrently, the history of the restraint, the evil sought to be addressed, and the reasons for the particular remedy adopted by the Association. This requires us to return to the history of the Pilots Act.

The Association designed the rotation system to ensure that pilots have approximately the same workload and to protect

against sending out fatigued pilots. *See* Sunset Review (2000) at 4 (explaining that "maintaining the work rotation schedules ... ensure[s] pilots are subject to approximately the same workload and they have had enough rest prior to boarding and piloting the next ship."). While application of the Association's rotation rules to docking masters may be of relatively recent origin, Maryland's policy of diminishing competition among pilots is not. *See, e.g.,* 1787 Md. Laws 278, Vol. 204, §§ 10 and 11 (requiring licensed pilots to offer their services "first to the vessel nearest the land or in most distress" and the masters of such ships to accept the pilot). In this regard, Maryland is no different from other maritime states. *See Kotch,* 330 U.S. at 561, 67 S.Ct. 910 (explaining that pilot associations arose to prevent competition among pilots and that " '[o]ne of the unfortunate results of intense competition was the fact that frequently pilots could not be had when wanted, [as] they might be far out to sea in quest of business.' " (quoting PILOTAGE IN THE UNITED STATES 28 (Department of Commerce 1917))).

We perceive significant benefits to the public in a work rule that allows a docking master to exercise discretion in calling for equipment that he or she thinks most suitable for a particular task. The rule allows the docking master to make this decision without fearing that the owner of the vessel will replace him or her with another docking master willing to attempt to perform the job with different tugs. In this regard, the work rule furthers the purpose and effect of BOP § 11–603(b)(2), which prohibits pilots from taking any action with the intent to benefit, or to harm, the economic interests of a tug company.

Moreover, the corresponding harm to KMTC is limited. Not only is the type of harm suffered by KMTC discrete in nature (the fact that KMTC cannot choose its own pilots), but the frequency of harm is small as well. At oral argument, all parties agreed that there are approximately 5,000 calls for tug services per year in and around the Port of Baltimore. Even so, at trial, KMTC presented evidence on just three instances that it believed restrained its ability to fairly and freely

conduct business. On these three occasions, KMTC lost business because the docking master in each instance independently determined that the available KMTC tugboats were inadequate to safely moor the vessel in question because of weather conditions. This was the extent of KMTC's harm on this issue. There was no evidence of any anti-competitive intent on behalf of the docking masters involved.[15]

Our review of the record establishes that Maryland's regulated pilotage system provides highly specialized services vital to the State's economic health as well as to the environment of the Chesapeake Bay. The Association's work rules and BOP § 11–603 have the effect of permitting docking masters to perform their duties free from any consideration other than the safe and efficient mooring of a vessel. The work rule also allocates the burden of providing docking master services among the handful of licensees. There is an incidental anti-competitive effect but, as we have explained, limitations on competition among pilots have long been an aspect of Maryland's pilotage law and are typical features of pilotage laws in the United States. *See Kotch,* 330 U.S. at 561, 67 S.Ct. 910; *Olsen v. Smith,* 195 U.S. 332, 344–45, 25 S.Ct. 52, 49 L.Ed. 224 (1904).

Indeed, the rotation schedule that KMTC criticizes is a common aspect of pilots associations. Parks & Cattell, *supra,* at 1049 ("The general form of a pilot association is that of a loose partnership, in which the various members maintain a central accounting and dispatch office and operate out of a pool; that is, the individual pilot members take turns piloting vessels on a rotation basis."); Thomas J. Schoenbaum, 2 ADMIRALTY AND MARITIME LAW 96 (5th ed. 2011) ("[Pilots] associations maintain a roster of pilots and a central office that receives requests for pilotage. [Pilots Associations] may dispatch pilots for duty on a rotating basis."); *accord Guy,* 203

---

**15.** Nor was there any evidence produced, assuming the job could be performed by another tug company, as to why KMTC could not purchase more modern equipment, with increased horsepower and maneuverability, to compete more effectively with the other tug companies and avoid this problem altogether.

U.S. at 404, 27 S.Ct. 63 (describing the Virginia Pilot Association as an "unincorporated association" made up of pilots whom "[b]y their agreement ... take turns in boarding vessels required by law to take a pilot"). That, on rare occasions, individual docking masters concluded that KMTC's tugs were inadequate does not weigh heavily in our analysis of the utility and reasonableness of the system.

In light of all of these considerations, we hold that KMTC failed to demonstrate that the Association's work rules implementing the rotation system are unreasonable or violate Maryland's Antitrust Act. The trial court did not err in granting the motion for judgment of the Association.

## II. Mandatory Membership in the Association

To this Court, Krause argues, under two distinct theories, that it is an unconstitutional use of a State's police power to require a pilot to be a member of the Association. Under one theory, he contends that the Act infringes upon his freedom of contract rights in violation of the due process clause of Article 24 of the Maryland Declaration of Rights.[16] The other argument asserted by Krause is that, under the equal protection portion of Article 24,[17] the Act unfairly distinguishes between pilots and "any other state professionals, licensed or otherwise" by requiring docking masters and pilots to be members of the Association. Krause asserts that, under either theory, "the required Association membership provision ... cannot surmount the hurdles that [the law] *not* be 'unreasonable' or 'arbitrary' or 'discriminating.' " (Emphasis in original).

The State argues that Krause did not raise a due process or equal protection argument based on Article 24 before the trial

---

**16.** Article 24 provides:

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

**17.** The protections afforded by Article 24 extend to equal protection of the laws. *See, e.g., State Admin. Bd. of Election Laws v. Board of Supvrs.*, 342 Md. 586, 595 n. 6, 679 A.2d 96 (1996).

court and that accordingly these contentions have not been preserved for appellate review. We agree with the State but only in part.

■ A review of the record establishes that Krause did not raise an equal protection argument before the trial court. We will not consider this contention for the first time on appeal. With regard to Krause's due process claim, it is true that Krause presented *a* due process argument to the trial court; however, as we will discuss, the due process argument that he presents to us on appeal is radically different from and inconsistent with the argument that he offered to the trial court. Accordingly, Krause's due process argument is not preserved.

The scope of our appellate review is determined by what "plainly appears by the record to have been raised in or decided by the trial court. . . ." Rule 8–131(a). This rule " 'is a matter of basic fairness to the trial court and to opposing counsel, as well as being fundamental to the proper administration of justice.' " *In re Kaleb K.,* 390 Md. 502, 513, 889 A.2d 1019 (2006) (quoting *Medley v. State,* 52 Md.App. 225, 231, 448 A.2d 363 (1982)). Specifically, "[o]n matters of such import and significance as constitutional questions, we cannot overstress the necessity of fully preserving the issue below. The trial court should be given not only the opportunity to rule, but also the assistance of counsels' arguments and memoranda in reaching its result." *Hall v. State,* 22 Md.App. 240, 245, 323 A.2d 435 (1974).

Throughout the proceedings before the trial court, Krause argued that the Pilots Act *as a whole,* and specifically BOP § 11–603, were facially invalid and unconstitutional.[18] On

---

18. As stated in appellants' amended complaint, Krause requested that the trial court declare BOP § 11–603, "and any other piloting law requiring Joseph Krause to practice his profession only through membership in the Association, to be an unlawful restraint of the right of freedom of contract. . . ." In opening statements on the State's motion for summary judgment, counsel for Krause emphasized that "Captain Krause is challenging the validity of the statute as a whole" and that "[t]he State will argue this is not a facial attack, but it is." Again, in

appeal, Krause's position is diametrically opposed to the position that he set forth before the trial court. He no longer challenges the Pilots Act *as a whole,* but instead claims that the appeal is only a challenge "to the required Association membership." As stated in his brief:

> To reiterate, this is not a challenge to the constitutionality of the Pilots Act as a whole, nor to the "conflict of interest" provision, § 11–603. It is a challenge only to the required Association membership, as violative of the Declaration of Rights, MD Code, Constitution, Art. 24, by depriving Captain Krause of his 'liberty or property,' i.e., his freedom to work as an independent contractor docking pilot."[19]

There are problems with Krause's new position. First, this much narrower question—which involves "a challenge only to the required Association membership" and not a facial challenge to the Pilots Act—was not before the trial court. Second, Krause has failed to identify the portion of the Act (if not

---

their opposition to the State's motion for judgment, appellants urged that "[b]oth Krause Marine and Captain Krause assert that the Pilots Act is an unlawful restraint on their respective freedoms of contract."

**19.** To understand Krause's *volte face,* we must return briefly to the proceedings before the trial court and consider an affirmative defense raised by the State.

Prior to filing the current action, Krause was the subject of an administrative disciplinary proceeding brought by the Board against him for an alleged violation of § 11–603. The Board prevailed before the administrative law judge. Krause sought judicial review and, eventually, the administrative decision was affirmed in part and reversed in part by a panel of this Court in *State Board of Pilots v. Krause,* No. 2979, September Term, 2007 (filed July 24, 2009), *cert. denied,* 411 Md. 357, 983 A.2d 432 (2009). Krause did not challenge the constitutionality of § 11–603 in that proceeding.

Before the trial court in the instant case, the State asserted that Krause waived the right to challenge § 11–603 by failing to raise it in the administrative proceeding. In response, Krause argued that the requirement of exhaustion of administrative remedies was inapplicable because he was challenging the Pilots Act as a whole, citing *Ins. Comm'r v. Equitable Life Assurance Soc'y of the United States,* 339 Md. 596, 619, 664 A.2d 862 (1995). Krause was adamant about characterizing his claim as a facial attack on the constitutionality of the Act (as opposed to a challenge to a discrete, fact-specific situation) to rebut the "exhaustion of administrative remedies" defense proffered by the State.

the Act as a whole or BOP § 11–603) that he wants invalidated. Krause insists that this is a challenge "to the required Association membership," but we cannot address this assertion if Krause does not direct us to the offending provision of the Act. *See* Maryland Rule 8–504(a)(5); *Citizens v. Board of Elections,* 201 Md.App. 605, 622 n. 18, 30 A.3d 245 (2011) (this Court will not consider arguments that are not presented with particularity). For these reasons, Krause's due process argument has not been preserved. Rule 8–131(a).[20]

### III. The Declaratory Judgment

"It has long been held that a person whose rights are affected by a statute may obtain a declaration of his rights and status." *DeWolfe v. Richmond,* —— Md. ——, ——, —— A.3d ——, 2012 WL 10853, at *13 (No. 34, Sept. Term, 2011, filed January 4, 2012) (citations and quotation marks omitted). Section 3–406 of the Courts and Judicial Proceedings Article states: "Any person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations under it." MD.CODE ANN., CTS. & JUD. PROC. ("CJP") § 3–406 (1973, 2006 Repl.Vol.). Likewise, CJP § 3–409 explains that "a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding. . . ."

As the Court of Appeals explained in *DeWolfe:*

---

**20.** Our own review of the Act leads us to conclude that no single provision of the Act requires pilots to be members of the Association. BOP § 11–603(c)(1) prohibits pilots from receiving remuneration for their services other than through the Association and BOP § 11–505(a)(2)(iii) requires the Association to distribute net fees to "regularly working licensed pilots who are members in good standing of the Association." The two statutes operate together to impose an effective requirement of Association membership, at least for those pilots who wish to earn a living through their services. Krause cannot simultaneously assert that "this is not a challenge to . . . the 'conflict of interest' provision, § 11–603" while also contending that this "is a challenge only to the required Association membership" when § 11–603 is an integral part of the statutory scheme requiring membership.

when a declaratory judgment action is brought and the controversy is appropriate for resolution by declaratory judgment, the court must enter a declaratory judgment, defining the rights and obligations of the parties or the status of the thing in controversy, and that judgment must be in writing and in a separate document. That requirement is applicable even if the action is not decided in favor of the party seeking the declaratory judgment.

*Id.* at ——, —— A.3d ——, 2012 WL 10853, at *14 (citations and quotation marks omitted). "The crucial question is whether the action is appropriate for declaratory judgment, that is, whether the declaratory judgment would terminate the controversy and whether there are actual, concrete, and adverse claims or interests, as provided by C.J.P. § 3–409." *Id.*

 Here, appellants requested declaratory relief and the pertinent allegations in appellants' amended complaint—i.e., that the work rules of the Association violated the State's Antitrust Act and that the Act unconstitutionally limited Krause's right to freedom of contract—presented "actual, concrete, and adverse claims." In disposing of them, the trial court simply stated "that the plaintiffs failed to present any credible evidence sufficient to establish any of their claims against any of the defendants." The trial court should have executed a separate judgment defining the rights and obligations of the parties. Had the court done so, it would have entered a judgment addressing the requests for declaratory relief as presented to it, not the requests as framed before us. Our instructions on remand will be limited to the issues raised before the trial court.

We remand this case to the trial court with instructions to enter a written judgment declaring that: (i) the February 2009 rules of the Association of Maryland Pilots implementing the rotation system did not violate CL § 11–204(a)(1); and (ii) the Pilots Act does not unlawfully restrain Krause's right of freedom of contract. *See Donnelly Adv. Corp. v. City of Baltimore,* 279 Md. 660, 672, 370 A.2d 1127 (1977) (When the trial court dismissed plaintiff's request for a declaratory judg-

ment action without a declaration of the parties' rights, remand for entry of declaratory judgment was appropriate.).

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED IN PART AND VACATED IN PART AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**APPELLANTS TO PAY COSTS.**