68 A.3d 872

**VEI CATONSVILLE, LLC**

v.

**EINBINDER PROPERTIES, LLC.**

**No. 265, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

June 25, 2013.

Benjamin Rosenberg (Andrew H. Baida, T. Christine Pham, Rosenberg, Martin, Greenberg, LLP, on the brief), Baltimore, MD, for Appellant.

Drake Zaharris & Benjamin Brownstein (Andrew G. Scott, Hodes Pessin & Katz, PA, on the brief), Towson, MD, for Appellee.

Panel: MEREDITH, WOODWARD, ARRIE W. DAVIS, (Retired, Specially Assigned), JJ.

DAVIS, J.

This appeal from a declaratory judgment presents the question of whether a commercial real estate appraisal was rendered in compliance with the dictates of the option agreement to purchase the subject property. VEI Catonsville, LLC (VEI) seeks our review of a declaration rendered by the Circuit Court for Baltimore County that an appraisal of the property at issue complied with the dictates of the "Agreement Regarding Right of First Refusal and Option to Purchase." VEI maintains that the chancellor erred by declaring that an appraisal of the property at issue did not adhere to the requirements of the Option. Appellee, Einbinder Properties, Inc. (Einbinder) disagrees, and moves to dismiss VEI's appeal, urging, in the alternative, that we affirm.

We decline Einbinder's invitation to dismiss VEI's appeal, but shall affirm the chancellor's declaration for the reasons set forth below.

## BACKGROUND [1]

On March 18, 1997, Circuit City Stores, Inc., a "national retailer of consumer electronics," the predecessor on the lease to VEI, entered into a commercial ground lease (Lease) with Joseph Y. Einbinder,[2] contracting to rent approximately 7.657 acres of land (Property) in Baltimore County for an initial term of twenty years, with six five-year renewable terms. The Property is known as 6026–6030 Baltimore National Pike and, at the time of the lease, had been the site of the Westview Cinema. The theater has since been razed and replaced by retail establishments—"HH Gregg, Vitamin World and Staples." The Lease contained a separate "Agreement Regard-

---

1. There is essentially no serious factual dispute, although a challenge to the credibility of the appraiser is implicit in VEI's argument. The background factual recitation that is necessary to address the issue before us is primarily based on the parties' "Stipulation of Facts." Testimony from the two days of hearings will be set forth as necessary.

2. Appellee Einbinder Properties, Inc., is the successor in interest to Mr. Einbinder.

ing Right of First Refusal and Option to Purchase." The "option to purchase" includes the following:

*Option to Purchase.* Landholder does hereby grant to CC the exclusive and irrevocable option to purchase the interest of Landholder in the property on and subject to the terms and conditions hereinafter set forth.

The agreement also established the method by which the purchase price would be determined:

The purchase price ("Purchase Price") payable upon the closing shall be the greater of FOUR MILLION FOUR HUNDRED TWENTY–EIGHT THOUSAND AND NO/ 100 DOLLARS ($4,428,000.00) *or the appraised value of the Property* subject to adjustments at closing as more fully set forth in subparagraph 2(d) below, which appraisal shall take into account (i) CC's right of first refusal, (ii) the extension rights granted to the holder of the leasehold estate in the Property, and (iii) the absence of a brokerage commission to be paid by Landholder, and *which appraisal shall not take into account the value of the leasehold improvements then-existing on the Property,* and which appraisal shall be conducted by an independent M.A.I. appraiser having at least fifteen (15) years experience in the field of commercial real estate and whose primary area of expertise is Baltimore County, Maryland reasonably satisfactory to Landholder and CC. (Emphasis added).

Circuit City filed for bankruptcy protection and, "on or about" March 17, 2009, "sold and assigned its interest as Lessee under the Lease to Vanguard Commercial Development, Inc." On August 10, 2009, Vanguard in turn assigned its interest in the lease to VEI.

In April, 2010, pursuant to the Option's requirement that they secure the services of an independent appraiser, the parties retained Ronald Lipman, a real estate consultant and appraiser, "to appraise the Property in accordance with the Option." Lipman submitted his appraisal of the Property on May 5, 2010. In the cover letter that accompanied the appraisal, Lipman outlined the "appraisal methodology":

The classic method for valuing vacant land is the sales comparison approach, wherein transactions involving properties considered similar to the subject are obtained, analyzed and adjusted to the subject property, utilizing a common denominator of value. In the appraisal of commercial sites similar to the subject, price per sq. ft. is the typical common denominator with, however, consideration of the amount of frontage the property enjoys on the commercial corridor.

If not for language contained in the Agreement Regarding Right of First Refusal and Option to Purchase, we would utilize the sales comparison approach exclusively. However, in paragraph 2 of that document, the appraiser is instructed to "take into account" Circuit City's right of first refusal, extension rights granted to the holder of the leasehold estate and the absence of a brokerage commission to be paid by the Lessor/Seller.

We interpret consideration of the leasehold estate's extension rights to mean that the existing land lease should be "taken into account". For this reason, we have also considered valuation of the leased fee (reversionary) estate (*i.e.* the right to the triple net income stream and the property reversion at the end of the lease) because of its influence on the "value" of the land in the context of this assignment. We would normally expect a well written lease to have been more explicit, but we believe that this alternative interpretation of the option language may also be relevant.

Therefore, we will consider both the sales comparison and the income approaches, the latter addressing value of the leased fee estate. In that valuation, we will estimate market value of the lessor's position. This is typically accomplished by use of direct capitalization wherein the ground lease income stream is translated into value by use of a market-abstracted capitalization rate.

Lipman submitted two figures based on separate valuation methods and explained this approach in his cover letter:

As a result of our investigation and by virtue of our experience, it is our opinion that, utilizing the sales comparison approach, market value of the subject property as of April 27, 2010 was $6,050,000 based on a sq. ft. rate of $22.50 applied against the subject's usable area (269,223 sq. ft.). It is further our opinion that, as of that same date, market value of the leased fee position of the subject property was $7,450,000 utilizing the current NNN rent, deducting modest expenses and applying a capitalization rate of 7.0%.

Lipman warned that there could be "no possible correlation" of the two values:

If the lease and the accompanying purchase option clearly stated that the unimproved land value, free and clear of the ground lease, with no references thereto, were the determinate of value in the context of the options then we would estimate value based exclusively on the sales comparison approach, *i.e.* SIX MILLION FIFTY THOUSAND (6,050,-000) DOLLARS.

If, on the other hand, the option to purchase would have clearly instructed the appraiser to value the leased fee estate or Lessor's reversionary interest, in consideration of the land lease, our value would be based exclusively on the leased fee, *i.e.* SEVEN MILLION FOUR HUNDRED FIFTY THOUSAND ($7,450,000) DOLLARS.

He explained the discrepancy:

M. Ronald Lipman has read numerous documents relating to real estate transactions over his 50 years of appraisal and consulting activity. Unfortunately, the purchase option in this matter is imprecise, vague and subject to interpretation. It simply states that the appraiser should "take into account" . . . the extension rights "granted to the holder of the leasehold estate in the Property," a nuance which is not necessarily a clear reference to leased fee value, but nonetheless, forces one to consider it.

There is a lack of clarity in the purchase option document and the reference to "extension rights" benefitting the leasehold estate. We have struggled in our effort to under-

stand the intent of the instructions and could understand reading it either of the two ways described above. In our position as appraisers, we do not believe that we have the ability to interpret it, nor the legal background to do so. And we understand that the two of you cannot agree on the appropriate (or legal) interpretation.

Accordingly, the two values reported above represent our response to the appraisal function we were engaged to perform. We believe that resolution of the issue is up to the two of you or, if required, the Courts.

Current conditions in the financial markets are in substantial disarray and their impact on real estate values are, at this time, difficult to measure. This valuation is based on the best information available at the time of analysis. As this uncertain environment continues to evolve there may be factors, currently unknown, which will impact property value.

On June 4, 2010, VEI filed an action seeking a declaration that the appraisal did not comply with the terms of the Option. VEI also sought a declaration that the purchase price for the subject Property should be set at $4,428,000.00. On September 24, 2010, Einbinder lodged a counterclaim, seeking a declaration that the option is unenforceable or, in the alternative, that the option has expired. Finally, Einbinder sought the alternative declaration that the purchase price for the Property should be $7,450,000 minus a 2.5% brokerage commission.

On March 2, 2011, at the end of the second day of testimony, the chancellor ruled in favor of Einbinder. The chancellor, explaining his ruling from the bench, concluded that the appraisal complied with the requirements of the option. It also determined that the correct purchase price was $7,450,000, reduced by the aforementioned brokerage commission and denied relief on Einbinder's counterclaim. The chancellor also ordered VEI to settle within 180 days. On March 3, 2011, the chancellor filed a written order that reflected this ruling. VEI moved for a stay and also urged the chancellor to alter or amend the judgment. The chancellor denied both

avenues of relief. VEI's subsequent motion for a stay pending appeal was granted and denied in part; VEI was ordered to post a supersedeas bond in the amount of $3,000,000.

This appeal followed. We shall set forth additional facts as required to address the issues before us.

## DISCUSSION

### I

 Einbinder avers that we should summarily dismiss VEI's appeal. Einbinder initially maintains that VEI "has waived its right to its appeal by . . . voluntarily closing on the Property at the price set by the Circuit Court," and contends that there exists "no longer an existing controversy[.]"[3] Einbinder further asserts that "this Court cannot, as a matter of law, provide VEI an effective remedy," a fact that would militate against appellate review. Einbinder points to the fact that VEI chose not to post a supersedeas bond to stay enforcement of the chancellor's judgment, pursuant to which VEI was directed to close on the Property within 180 days.

We are not persuaded that VEI's actions have ended this litigation.

### A

 The "right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right to appeal." *Rocks v. Brosius,* 241 Md. 612, 630, 217 A.2d 531 (1966). *Accord, Dietz v. Dietz,* 351 Md. 683, 689, 720 A.2d 298 (1998); *Osztreicher v. Juanteguy,* 338 Md. 528, 534, 659 A.2d 1278 (1995); *Dziamko v. Chuhaj,* 193 Md.App. 98, 107, 996 A.2d 893, *cert. denied,* 416 Md. 273, 6 A.3d 905 (2010). The "doctrine of acquiescence—or waiver—is that 'a voluntary act of a party which is inconsistent with the assignment of errors on appeal normally precludes that party from obtaining appellate review.'" *Exxon Mobil Corp. v. Ford,* 433 Md. 426, 462, 71 A.3d 105 (2013) (quoting *Bd. of*

---

3. VEI closed on the property on August 25, 2011.

*Physician Quality Assurance v. Levitsky,* 353 Md. 188, 200, 725 A.2d 1027 (1999) (further citation omitted)). This "doctrine of waiver is also known as "estoppel," acceptance of benefits creating mootness, and acquiescence in judgment." *Exxon Mobil,* 433 Md. at 462, 71 A.3d 105 (quoting *Downtown Brewing Co. v. Mayor & City Council of Ocean City,* 370 Md. 145, 149, 803 A.2d 545 (2002)).

The following factors illustrate actions by a party that have been deemed to preclude that party's right to appeal:

[W]e have heretofore held that the filing of a remittitur by the beneficiary, combined with the acceptance of the tendered payment of the award and causing the court record to be marked as satisfied, brings the litigation to a complete conclusion, thus barring an appeal by the judgment creditor, *Kneas v. Hecht Company,* 257 Md. 121, 124–26, 262 A.2d 518, 520–21 (1970); that no appeal lies from a consent decree, *Mercantile Trust Co. v. Schloss,* 165 Md. 18, 24, 166 A. 599, 601–02 (1933); and that after an invocation of the benefits accruing under an order of court, a party will not be heard to assail its validity. *Stewart v. McCaddin,* 107 Md. 314, 318–19, 68 A. 571, 573 (1908). This general rule of preclusion enunciated in the Brosius case has been variously characterized as an "estoppel," *Dubin v. Mobile Land Corp.,* 250 Md. 349, 353, 243 A.2d 585, 587 (1968), a "waiver" of the right to appeal, *id.* at 353, 243 A.2d at 587; *Bowers v. Soper,* 148 Md. 695, 697, 130 A. 330, 331 (1925), an "acceptance of benefits" of the court determination, *Dubin v. Mobile Land Corp., supra,* creating "mootness," *Durst v. Durst,* 225 Md. 175, 182, 169 A.2d 755, 758 (1961), and an "acquiescence" in the judgment, *Rocks v. Brosius, supra; Stewart v. McCaddin, supra* at 318, 68 A. at 573. We think the label applied to the rule is less important than its essence—that voluntary act of a party which is inconsistent with the assignment of errors on appeal normally precludes that party from obtaining appellate review.

*Franzen v. Dubinok,* 290 Md. 65, 68, 427 A.2d 1002 (1981).

Notwithstanding, it is "too well settled by authority to require further discussion that a party against whom a judg-

ment has been rendered is not prevented from appealing to this court by the fact that he has paid the judgment, unless such payment was by way of compromise, or with an agreement not to take or pursue an appeal." *Franzen,* 290 Md. at 72, 427 A.2d 1002 (quoting *Hayes v. Nourse,* 107 N.Y. 577, 14 N.E. 508, 508 (1887)).

The *Franzen* Court pointed out that the "focus of the inquiry must be on whether the compliance with the judgment is the result of legally sufficient compulsion." *Franzen,* 290 Md. at 69, 427 A.2d 1002. The Court agreed with the "proposition, entertained by practically all jurisdictions, that payment tendered after the issuance of execution on a judgment is clearly coerced[,]" and that an appellant's failure to secure a "stay or other supersedeas pending appeal is normally held to have no effect on the voluntariness determination[.]"[4] *Id.,* 290 Md. at 69–70, 427 A.2d 1002.

We consider the recent opinion by the Alaska Supreme Court in *Leisnoi, Inc. v. Merdes & Merdes, P.C.,* 307 P.3d 879, 2013 WL 386373 (Alaska 2013), to be instructive. This case involved a dispute between Leisnoi, an Alaska Native corporation, and a law firm that had represented it in a matter under the Alaska Native Claims Settlement Act. The law firm successfully represented Leisnoi in litigation that would continue for more than a decade. Leisnoi disputed the fee arrangement, but an arbitrator ruled in the law firm's favor and the latter obtained a judgment for the unpaid legal fees. Leisnoi made payments until 2002, when it went into default. The law firm did not seek a writ of execution on the judgment until 2008. Leisnoi opposed the firm's efforts to collect its legal fees, but suffered a setback when a trial court in January 2010

---

4. The Court held that Franzen's appeal was nevertheless barred, because there was no final judgment or complete adjudication of the rights of the parties to that action, such that there were none of the factors that would constitute legal coercion—no judgment lien or right of execution. That case involved both actions at law and a related action for equitable relief. According to the Court, "[p]re-final judgment payment is a settlement of a claim in advance of a judicial determination, from which, of course, no appeal will lie." *Franzen v. Dubinok,* 290 Md. 65, 74–75, 427 A.2d 1002 (1981).

granted the firm's motion to execute. Following the trial court's order, Leisnoi paid the firm the outstanding balance and also appealed the trial court's ruling.

On appeal to the Alaska Supreme Court, the law firm argued that Leisnoi waived its right to appeal by voluntarily satisfying the judgment against it. The firm cited to decisions from other jurisdictions for the proposition that, "when a judgment debtor voluntarily satisfies the judgment in full, he waives any right to appeal." Leisnoi explained why it should prosecute its appeal by citing to its "limited options":

> Leisnoi replies that it had limited options in response to Merdes's [the law firm's] pursuit of execution upon the judgment: It could do nothing and allow Merdes to collect the judgment; it could seek a stay of enforcement of the judgment by posting a supersedeas bond; or it could pay the judgment. Leisnoi characterizes the first two options as so undesirable—based on both the potential "embarrassment" and disruption of its business associated with involuntary collection procedures and the high cost of posting a supersedeas bond—that it had no choice but to pay the judgment.

*Leisnoi,* 307 P.3d at 885, 2013 WL 386373, *4.

The Alaska court, viewing this issue as a matter of first impression, conducted an extensive survey of applicable decisions from other jurisdictions before concluding that a judgment debtor does not forfeit the right to appeal by paying a judgment and then seeking to overturn the judgment:

> We agree with the U.S. Supreme Court that "[t]here can be no question that a debtor against whom a judgment for money is recovered may pay that judgment and bring a writ of error to reverse it, and if reversed can recover back his money." As the Sixth Circuit explained,
>
>> [A] defeated party's compliance with a . . . [trial] court ruling does not bar him from appealing unless his compliance has made it impossible for the appellate court to grant effective relief. This is true even if the defeated

party has failed to avail himself of an opportunity to obtain a stay of the proceedings or a supersedeas.

*Leisnoi, Inc.,* 307 P.3d at 886, 2013 WL 386373 (quoting *Uyeda v. Brooks,* 348 F.2d 633, 635 (6th Cir.1965) (footnotes omitted)). *See also Hampton Assocs. Ltd. v. Baltimore County,* 66 Md.App. 551, 556, 505 A.2d 537, *cert. denied,* 307 Md. 406, 514 A.2d 24 (1986).

Maryland law is well-established that a "party is not precluded from pursuing an appeal when he or she merely complies with a court order, because such action is not voluntary." *Taylor v. Mandel,* 402 Md. 109, 126, 935 A.2d 671 (2007). We believe that VEI could reasonably conclude that, in view of the chancellor's order, its options were limited and that, on this record, its decision to go to settlement was not "voluntary" for purposes of the acquiescence rule. On this record, we are unable to conclude that VEI is barred from appealing the chancellor's order.[5]

## II

▇ VEI does not fare as well on the merits, however. We conclude that the chancellor did not err in holding that Lipman's appraisal complied with the provisions of the Option. We explain.

### Standard of Review

▇ The "interpretation of a contract [presents] a question of law." *Questar Builders, Inc. v. CB Flooring, LLC,* 410 Md.

---

5. Einbinder also asserts that VEI "cannot obtain" the relief it seeks on appeal as a matter of law, *viz.,* that this Court vacate the chancellor's ruling and direct a new appraisal. In view of our disposition of this case, we do not address this specific preservation argument. We note in passing that a ruling in favor of VEI on appeal would not necessarily entail a complete reversal of the chancellor's ruling and require a new appraisal. The chancellor and, even this Court in the appropriate instance, could have fashioned such equitable relief as deemed appropriate, short of requiring a new appraisal. *Cf. Howard v. Montgomery Mut. Ins. Co.,* 145 Md.App. 549, 565 n. 4, 805 A.2d 1167 (noting that appellate court may review merits and remand for appropriate declaratory judgment), *cert. denied,* 372 Md. 431, 813 A.2d 258 (2002).

241, 262, 978 A.2d 651 (2009) (quoting *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II, L.L.C.,* 376 Md. 157, 163, 829 A.2d 540 (2003)); *Spengler v. Sears, Roebuck & Co.,* 163 Md.App. 220, 239, 878 A.2d 628 (2005). Our review of the chancellor's construction of the Option contract in this case is therefore *de novo. See Questar,* 410 Md. at 261, 978 A.2d 651. *Cf. Pacificorp, Inc. v. Dep't of Revenue,* 31 P.3d 64, 65 (Wyo.2001) ("proper application of appraisal methods to the facts is an issue of ultimate fact requiring de novo review"); *Dominguez Energy v. County of Los Angeles,* 56 Cal.App.4th 839, 65 Cal.Rptr.2d 766, 773 (1997) (*de novo* review of challenge to validity of valuation method). "In contrast, we set aside a trial court's factual determinations only when they are clearly erroneous and, in making that evaluation, we must 'give due regard to the opportunity of the trial court to judge the credibility of the witnesses.'" *Krause Marine Towing Corp. v. Ass'n of Maryland Pilots,* 205 Md.App. 194, 206 (2012) (quoting Md. Rule 8–131(c)).

### Argument

VEI insists that Lipman's appraisal necessarily accounted for the value of the improvements, in contravention of the Option. VEI cites to the appraiser's acknowledgment that there was "a reasonable point at which the value of those improvements contribute . . . sufficiently to make one select a capitalization rate . . . that reflects the security of the income stream." VEI also points out that Lipman's appraisal chose a "very low capitalization rate solely because the lease is 'guaranteed' by the value of the improvements." (internal quotations omitted). It follows, VEI insists, that the "value of the improvements . . . played a central role in determining the appraised value of the Property[.]" VEI emphasizes that the "Option prohibited Mr. Lipman from considering in any manner, specifically or otherwise, the value of the leasehold improvements in determining the appraised value of the property." VEI challenges Lipman's application of the income approach and calculation of a capitalization rate, or "cap rate," as an approach explicitly prohibited by the Option. Because

the appraisal thus ran afoul of the Option's prohibition of any consideration of the value of the then existing improvements, VEI urges that we reverse the chancellor's decision and remand with directions that a new appraisal be made.

Einbinder disagrees with the premise of VEI's argument, *viz.* that the appraiser's use of the "income approach" violated the terms of the Option. Instead, Einbinder urges that VEI ignores the basic distinction in the appraiser's analysis—that the existence of the improvements and, not their specific value, was considered in the appraisal. We believe that Einbinder's argument is more tenable and explain.

### Chancellor's Ruling

The chancellor ruled in favor of Einbinder, explaining his decision in detail:

JUDGE STRINGER: Now, in this declaratory judgment action, the Court is being asked to declare the rights of the parties under the terms of an option to purchase, which has been incorporated into the ground lease, I believe?

\* \* \*

JUDGE STRINGER: ... Now, with respect to this option to purchase which is the subject of this case, I do not find the contract to be ambiguous.... The dispute arose over the application of the provisions of the option in the valuation of the property. I also find that the contract is sufficiently definite [and] I find that in this case, the option which provides a method to determine the purchase price, is sufficiently definite and, therefore, I believe that the option to purchase is enforceable.

As a preface to his discussion, the chancellor first outlined the Option's relevant terms:

Now, the option provides that the purchase price shall be the greater of $4,428,000.00 or the appraised value of the property subject to adjustments at closing which are set forth in subparagraph 2(d) and the appraisal shall take into account (i) Circuit City's right of first refusal, (ii) the extension rights granted to the holder of the leasehold

estate in the property and (iii) the absence of a brokerage commission to be paid by the landlord and it provides further that the appraisal shall not take into account the value of the leasehold improvements then existing on the property.

The chancellor then set forth the pertinent issue:

The issue has become whether Mr. Lipman's report valued the property as provided in the option and took into account, in particular, (ii) the extension rights granted to the holder of the leasehold estate in the property but not take into account the value of the leasehold improvements then existing on the property as required by the terms of the option.

He concluded that the appraisal complied with the terms of the Option and explained why alternative appraisal methods were less appropriate:

Mr. Lipman gave, submitted a report with two different values, done by two different methods. . . . Mr. Lipman testified that to do the appraisal by the sales approach would ignore the extension rights granted under the provisions of the option[.] . . . Mr. Lipman couldn't . . . do an appraisal by the sales method and consider the extension rights granted under the ground lease and which was required by the option and since the option requires consideration of those extension rights, the sales valuation by Mr. Lipman has not complied with the conditions provided in the option.

The chancellor specifically approved of the employment of the income valuation approach:

Now, Mr. Lipman also provided a value using an income approach to appraise the property. There seems to be an issue that arose regarding the valuation of the property versus the interest of the landholder and VEI was zeroing in on the language in the option with respect to the provision providing for the purchase price which required the "appraisal value of the property" and I believe that VEI was raising the question about whether Mr. Lipman's appraisal

valued the property versus merely valuing the landholder's interest in the property. The testimony from Mr. Lipman and Mr. Duncan was that the income approach is a recognized method of appraising property and Mr. Lipman provided a value of the property taking into account the extension rights granted to the holder of the leasehold and these-were questions I specifically asked because I wanted answers to, both Mr. Lipman and Mr. Duncan testified that the income method provided a standard recognized method of valuation of the property and did so taking into account the extension rights to the holder of the leasehold as provided or required in the option. In other words, Mr. Lipman's income appraisal or his appraisal by the income approach, did exactly what the option required him to do. He valued the property and his appraisal took into account all three of those considerations, Circuit City's right of first refusal, the extension rights granted to the holder of the leasehold estate in the property and the absence of the brokerage commission, which I'll get to a little later. But he definitely took into consideration the extension rights granted to the holder of the leasehold estate in his valuation of the property which is why he did use the income approach.

The chancellor was not convinced by VEI's contention that Lipman's appraisal method necessarily must have accounted for the value of the improvements, contrary to the dictates of the option:

VEI has also argued that Mr. Lipman's income approach violates the terms of the option because the cap rate is dependent upon the value of the leasehold improvements which is prohibited or, or the option provides that the value of the leasehold improvements shall not be taken into account. Mr. Lipman testified that the fact that there were improvements that existed on the property secured the rental income stream because tenants would not walk away or not be, would not be likely to walk away from the improvements that they had paid to build.

Instead, the chancellor credited Lipman's explicit assurances that such value had not been considered in rendering the appraisal. He emphasized his decision to credit Lipman's explanations.

But he was clear in his testimony that he did not consider the value of those improvements. Mr. Rosenberg emphasized Mr. Lipman's statement in his report, which no criticism of that, Mr. Rosenberg is a very good lawyer and picked up on something that Mr. Lipman had said in his report and had apparently repeated in his deposition which states that he considered the value of the improvements but Mr. Lipman explained that he did not consider a specific value of the improvements to be added to his opinion on the overall valuation of the property. The value of the buildings did not enter his valuation, rather it was the existence of those improvements that were merely a risk factor in determining the cap rate. Mr. Lipman did not select a cap rate based on the value of the improvements. It was merely their existence that was apparently incorporated in the cap rate and the e-mails that were introduced into evidence showed that Mr. Lipman recognized he was not to consider the value of the improvements as part of his opinion on value and the option provisions, I should say the option provision, does not prohibit Mr. Lipman from considering the existence of the improvements, rather the option prohibits him from "taking into account the value of the leasehold improvements then existing on the property and Mr. Lipman did not take into account the value of those leasehold improvements nor did he consider the rental income from those improvements, from the subleases." In other words, he did not consider the rent from Staples or H.H. Gregg or Vitamin World. I think this is important with respect to, I know Mr. Rosenberg raised the question, well, now he's saying this in Court when in his report, one line in the report, page twenty-three, said something else but to be fair, looking at his report and, in particular, the whole section that he devoted to analyzing what cap rate to use, I think the report corroborates that he did not consider

the value of the improvements in determining the cap rate and I refer to Mr. Lipman's report, pages twenty-four through twenty-six when he details how he selected the cap rate and decided on the appropriate cap rate.

The chancellor further noted that, while Mr. Lipman "does mention some improved properties," he confines the "references to the character of those properties, which are somewhat similar to the subject lease." The chancellor emphasized that

Mr. Lipman does not compare the value of the improvements on the subject property to any other properties and doesn't even mention the value of the improvements on the subject property and those three pages where he details how he arrived at a cap rate. Although there was, he considered a number of factors, there was no mention of the value of the improvements in how he arrived at the cap rate. Mr. Lipman never valued the improvements and didn't assume a value of the improvements on the subject property and Mr. Lipman also testified that if he did consider the value of the improvements, his appraisal would have been significantly greater. I also note the purpose of the provision, the provision, again, not to take into account the value of the leasehold improvements in, on which all experts agree, all three experts agreed on the purpose for that provision. It was because with the option to purchase the property, the leasehold owner or the tenant who paid to build the improvements would not have to pay for them twice. In other words, the tenant would not have to pay the landowner to buy buildings that the tenant had paid to build and I find that Mr. Lipman's income valuation complies with the plain language of the option. His income valuation complies with all the terms and conditions of the option and it's consistent with the purpose of the option, that the tenant not have to pay the landholder for buildings that the tenant paid to build, therefore, I find that Mr. Lipman's appraisal using the income approach complies with, well, the testimony was that it complied with the standards of appraisal of property in the industry, he's qualified, he has the necessary

experience and he was chosen by the parties. The Court, therefore, determines that the purchase price under the option to purchase to be $7,450,000.00 reduced by two and a half percent which, by my math, comes to $7,263,750.00.

The chancellor rejected Einbinder's counterclaim in which it asserted that the option had expired and was no longer in effect. Instead, he reinstated the parties to the positions they were in at the time of receipt of the appraisal. Pursuant to this premise, the chancellor ordered that "VEI has between ninety to one hundred and eighty days to go to settlement and close on the purchase of the property and that's what I will order, that VEI has, I will prepare a written Order and from the date of that Order, VEI has between ninety to a hundred and eighty days to go to settlement, close on the purchase of the property and the price shall be $7,263,750.00." [6]

## Analysis

In assessing the value of commercial real estate, appraisers generally rely on three methods for valuation:

The comparable sales approach estimates market value by looking to recent voluntary sales transactions involving properties similar to the subject property, and adjusts for any differences between each comparable property sold and the subject property. 7A P.J. Rohan & M.A. Reskin, Nichols on Eminent Domain § 9A.04[1][c][i], at 9A–32 (3d ed. rev.2001). The income approach projects the net income that would be expected by the owner of the business and calculates the present value of the projected net income stream. *Id.* § 9A.04[1][c][iii], at 9A–35–36. The cost approach looks to the cost to build another identical facility, adds the value of the land, as zoned but unimproved, and subtracts depreciation and obsolescence. *Id.* § 9A.04[1][c][ii], at 9A–34. The cost approach is either "reproduction cost" or "replacement cost." The former "implies an identical replication of the existing structure with

---

**6.** At this juncture, the post-judgment actions of the parties need not concern us.

the same material and design." 8 P.J. Rohan & M.A. Reskin, Nichols § 14A.06[2][d], at 14A–21 (3d ed. rev.2001) (footnote omitted).

*Washington Suburban Sanitary Comm'n v. Utilities, Inc.*, 365 Md. 1, 11 n. 5, 775 A.2d 1178 (2001). As noted by one commentator:

The central concern in real estate decision-making is the scientific estimation of value. To estimate the value of real property, real estate practitioners have traditionally adhered to the use of three approaches: cost, market, and income.

James H. Burton, EVALUATION OF THE INCOME APPROACH at xi (American Institute of Real Estate Appraisers 1982). *See Mayor and City Council of Baltimore v. Concord Baptist Church, Inc.*, 257 Md. 132, 141, 262 A.2d 755 (1970) (setting forth "three avenues by which fair market value may be approached") (citing cases).

A mortgage lender who makes a loan for the acquisition of income property "depends primarily on income from the operation of the property for debt repayment[.]" Royal Shipp, *Property Income Streams—Measuring and Evaluating their Size and Certainty* (1970) in 1 READINGS IN THE INCOME APPROACH TO REAL PROPERTY VALUATION 37 at 39 (American Institute of Real Estate Appraisers 1977). As noted by the North Carolina Supreme Court in a tax assessment case, "the income approach is generally considered the most reliable method for determining the market value of investment property[.]" *In re Appeal of the Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 576 S.E.2d 316, 320 (2003). Maryland cases echo this view:

[Maryland] cases have long recognized that capitalization of income is a relevant factor to be considered by the assessing authorities, particularly in assessing income producing properties. This is no more than a recognition of the reality that income producing properties are bought and sold on the basis of the income which they actually produce.

*Supervisor of Assessments of Allegany Cnty. v. Ort Children Trust Four,* 294 Md. 195, 202, 448 A.2d 947 (1982) (citation omitted). More recently, the Court observed:

Under the capitalization of income approach, income earned from a property is most indicative of its value.... Essentially, the value of a property is based upon what income the property is expected to generate on an annual basis, reduced by its operating expenses to yield its net operating income.

Once the net operating income is determined, comparable properties are consulted with respect to their market value as well as their net operating income during the relevant time in issue, in order to determine the capitalization rate or the rate that reflects the anticipated benefits and risk if the property were acquired.... In lieu of established capitalization rates for other properties, a property valuation based on the income approach may depend upon an assumed capitalization rate for the property in issue reliant upon market surveys of investor expectations.... The capitalization rate may be upwardly adjusted for the risk of investing in the property in issue, or the likelihood that the property will not produce its anticipated income, as the uncertainty of future income loss is considered to detract from a property's market value.... Risk is evidenced by "the credit rating of the property's tenants [and] the stability of the property's income stream." Once the capitalization rate is calculated, it is then applied to the property at issue, by dividing it into the net operating income to derive value. The higher the capitalization rate, the lower the value.

*Cordish Power Plant Ltd. P'ship v. Supervisor of Assessments for Baltimore City,* 427 Md. 1, 6–7, 45 A.3d 273 (2012) (citations and footnotes omitted). The "income approach" method has also been defined as follows:

An appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income. The capital amount, called the capitalized value, is, in effect, the sum of the anticipated annual rents less the loss of interest until

the time of collection. The reliability of this technique is dependent upon four conditions: (a) the reasonableness of the estimate of the anticipated net incomes; (b) the duration of the net annual income, usually the economic life of the building; (c) the capitalization (discount rate); and (d) the method of conversion (income to capital).

John F. Adams, Jr., *Analysis of Factors influencing Value* (1969), in READINGS IN REAL PROPERTY VALUATION PRINCIPLES 207, 209 (American Institute of Real Estate Appraisers 1977). "[T]his income is inseparable from the property value." Shipp, *Property Income Streams* at 39. Dr. Shipp further observes:

> The importance of property income in analyzing loans on income properties is revealed by comparison with home loans. The funds needed to service a mortgage loan on an income property are directly related to, and derived from, the value of the services provided by that property [while the income for servicing a home loan is typically based on the borrower's occupation]. [I]ncome property market value is determined by estimates for future property income streams; any decline in income is thus paralleled by a proportional decline in property value.

*Id.* Moreover,

> [i]n evaluating the adequacy of *net income,* two related aspects must be considered: (1) the size of the amount of the income stream (called *income "quantity"* by appraisers); and (2) the certainty of the income stream, or the likelihood that it will be realized (called *income "quality"* by appraisers).

*Id.* at 41.

In the final analysis, "[p]roperty values are determined [pursuant to the "income approach"] by capitalizing estimated net income at an appropriate rate." *Id.* at 50. *See also, e.g., Weyerhaeuser Co. v. Easter,* 126 Wash.2d 370, 894 P.2d 1290, 1293 n. 2 (1995) ("income approach calculates value by estimating the future benefits produced by assets.").

We are not persuaded by VEI's claim that Mr. Lipman's appraisal violated the Option's prohibition against the valuation of the improvements on the Property. We are mindful of VEI's insistence that the appraisal indeed accounted for the value of the improvements, for, as VEI maintains in its opening brief:

Mr. Lipman underscored the profound impact the value of the improvements had on his appraisal of the Property by selecting a capitalization rate which was similar to the rates used to value leases with such creditworthy corporate tenants as Walgreens, McDonald's, and Starbucks. Mr. Lipman admitted that he did not know what the creditworthiness of VEI was and that he gave "no weight" to VEI's creditworthiness. Instead, as the Appraisal plainly states, Mr. Lipman selected a very low capitalization rate solely because the lease is " 'guaranteed' by the value of the improvements." Mr. Lipman explained at trial that "the reason that this is an important consideration is that the selection of a cap rate is influenced by the security for the income stream that you're capitalizing." Mr. Lipman also testified that the value of the improvements was significant enough to secure the income stream and was much greater than $500,000, stating that "commercial buildings, in this type of location are worth many times that [i.e., $500,000] so that's another ridiculously low number."

Although Mr. Lipman stated that he did not value the improvements but instead relied on "simply their existence," he acknowledged that there is "a reasonable point at which the value of those improvements contribute . . . sufficiently to make one select a capitalization rate . . . that reflects the security of the income stream." Recognizing that this point had been reached in this case, Mr. Lipman testified that "this is a highly secure income stream and highly secured income stream deserves a lower rate of return." Terry Dunkin, who testified as an expert for Einbinder, agreed, stating that because "the amount of risk in collecting the rent" from VEI "is minimal," this "is a very secure situation and, therefore, the interest rate is very low." The value of

the improvements, therefore, played a central role in determining the appraised value of the Property because, as Mr. Lipman testified, "the lower the cap rate, the higher the value given the same income stream."

Notwithstanding, during vigorous examination by VEI's counsel, Lipman clarified language in the appraisal report that suggested he had valued the improvements on the Property in contravention of the Option. The transcript from the second day of the hearing reflects the following during vigorous cross-examination.[7]

MR. ROSENBERG (VEI counsel): And you wouldn't consider the value of the premises, of the improvements?

MR. LIPMAN: In neither case did I.

MR. ROSENBERG: In neither case did you consider the value . . .

MR. LIPMAN: Value of the improvements.

MR. ROSENBERG: Okay. Well, in your appraisal, sir, page twenty-three, I think you said that the income stream was guaranteed by the value of the improvements, isn't that right?

MR. LIPMAN: I meant to say as I testified earlier that it was the existence of the improvements, not the value of the improvements.

MR. ROSENBERG: When did you mean to say that?

MR. LIPMAN: From the very beginning.

MR. ROSENBERG: Okay. What's the date of your appraisal?

MR. LIPMAN: May 5th 2010.

MR. ROSENBERG: I took your deposition on October 6th, 2010, didn't I?

MR. LIPMAN: Yes.

---

7. Indeed, an "opposing party has every right to raise the spectre of inconsistencies and to attempt to impeach [the appraiser] thereby." *Mayor & City Council of Baltimore v. Smulyan,* 41 Md.App. 202, 220, 397 A.2d 198 (citations omitted), *cert. denied,* 285 Md. 728 (1979).

MR. ROSENBERG: Let's see, five and ten, five months later. Did you mean to say the existence of the improvements then?

MR. LIPMAN: Yes, I did.

MR. ROSENBERG: Let's see what you told me. First of all, you knew that you were to ignore the improvements, didn't you?

MR. LIPMAN: In terms of the value, the contributing value of the improvements, yes.

MR. ROSENBERG: And didn't you tell me that when you determined that this seven percent cap rate was appropriate, you did that because you considered the value of the lease, of the leasehold improvements?

MR. LIPMAN: Again, I meant the existence of them, not the contributory value.

MR. ROSENBERG: So you misspoke in your appraisal and you misspoke again when I asked you about it at your deposition?

MR. LIPMAN: And hopefully I corrected it when I was testifying.

MR. ROSENBERG: And now you're correcting it?

MR. LIPMAN: Well, yesterday, I think I corrected it.

MR. ROSENBERG: Okay. But your appraisal itself said that you used the lease, the value of the leasehold improvements in determining the income stream value.

MR. LIPMAN: I explained this fully at some point yesterday.

MR. ROSENBERG: I know you explained it. I'm just asking you what your appraisal says.

MR. LIPMAN: It says what you've just read.

MR. ROSENBERG: Okay. But you didn't mean it?

MR. LIPMAN: The, the meaning that I intended to convey was that the existence of those improvements was such that I could be assured, or the lease, the ground lease owner, could be assured that the six five year options would be, all be exercised.

MR. ROSENBERG: That's what you meant to say but what you didn't say?

MR. LIPMAN: That's correct.

Terry Duncan, who was qualified as an expert in the field of real estate appraisal, also provided the rationale behind the use of an income approach, given the language of the Option:

MR. DUNKIN: Well, my opinion is if you're buying the landholder's interest, the only right you have is the right to collect that income and get that property back at some point in the future and I would, I would do an income analysis because I'm not buying the land, I'm buying, I'm buying a cash flow is what I'm buying.

Dunkin testified that one would have to "acknowledge the existence of the improvements," but would not "ascribe any value to those improvements[.]" This was to avoid requiring the tenant "to pay twice for the buildings he already built once." Although one would "acknowledge the presence of the buildings[,]" Dunkin expressed his approval of the methodology employed by Lipman:

MR. ZAHARRIS [Einbinder's Counsel]: And did you form an opinion about whether Mr. Lipman used proper appraisal methodologies to arrive at the values he arrived at in his appraisal?

MR. DUNKIN: Yes, I, I, I reviewed the appraisal and I reviewed many appraisals, I served on the review panel for the Appraisal Institute for many years and have reviewed appraisals for banks and, and others. You know, based on the standards of the uniform appraisal practice, the, the standards and the techniques that he used, I think, were reasonable and appropriate, the valuation I believe to be reasonably reflective of the, of the land value in the one instance and, and the value of the landholder's interest in the other instance.

The chancellor was entitled to credit Lipman's explanation for the use of the income approach valuation method, as well as the appraiser's testimony that he did not value the property in contravention of the Options. We accord considerable

deference to the credibility determinations of the chancellor. *See Furda v. State,* 421 Md. 332, 353, 26 A.3d 918 (2011).

Nor are we persuaded that references to the *existence* of the improvements as one factor in assessing the income potential of the property, would entail a consideration of the *value* of the improvements, a factor that the option dictated should not be considered. There is a basic distinction between the discrete value of specific improvements on commercial property and the role such property plays in adding value to the income stream. VEI, and Circuit City before it, paid to construct the improvements on the property. The cost of the brick and mortar should not be borne anew and that idea is not in dispute. But the presence of improvements may constitute an income multiplier and its potential to enhance the income stream is one hallmark of the overall value of commercial property whose role it is to produce income.

It bears emphasis that it is the "cost to reproduce method," an approach not employed here, pursuant to which the value of improvements plays a key role in property valuation. As noted by the Court in *Cordish,* "[u]nder the cost to reproduce method, market value is the cost to build the same building or improvement on the land on which the property at issue is located." *Cordish,* 427 Md. at 5, 45 A.3d 273 (citation omitted). In other words, the "cost approach [is] that which is predicated on the concept that the total value of improved property is equivalent to the market value of the land plus the cost of the improvements." Julius L. Sackman, *The Limitations of the Cost Approach* (1968), in READINGS IN REAL PROPERTY VALUATION PRINCIPLES, *ante,* at 225. Had Lipman intended to account for the cost value of the improvements, he would likely have utilized the cost approach to value the Property. In this case, Lipman offered one appraisal pursuant to the sales comparison method. When faced with the requirement that he consider Circuit City's right of first refusal, extension rights and the absence of a brokerage commission, Lipman virtually was compelled to employ the income approach, essentially the sole remaining valuation par-

adigm. Indeed, the record supports the conclusion that the use of this method did not violate the Option.

We hold, first, that, for purposes of maintaining its right to appeal, VEI did not acquiesce in the chancellor's ruling by going to settlement on the Property. We also conclude that the chancellor correctly determined that the appraisal rendered by Lipman conformed to the dictates of the Option agreement in that it did not account for the value of the improvements; the chancellor did not err by declaring that the valuation methodology based on the "income approach" conformed to the requirements of the Option.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**